# JEFF HUGHES and TRAVIS TOMLIN V. THE STATE.

No. 20025.  Delivered December 21, 1938.
Rehearing Denied February 8, 1939.

The opinion states the case.

*Emmett Wilburn* and *Davis, Avery & Wallace,* all of Center, for appellants.

*Lloyd W. Davidson,* State's Attorney, o'f Austin, for the State.

KRUEGER, JUDGE.—The offense is rape; the punishment assessed is confinement in the state penitentiary for a term of five years.

Appellants' main contention is that the evidence is insufficient to sustain their conviction of rape by force and without the consent of the alleged injured female. Prosecutrix testified, in substance, that on the night of April 16, 1937, she attended a dance at Shorty Samford's home. That after they had danced a while, the appellants asked Annie Mae Fields and herself to go with them to an automobile and talk awhile, to which they agreed. In going to where the car was parked, she and Jeff Hughes led the way and Miss Fields and Tomlin followed. Hughes and prosecutrix entered a sedan parked furtherest away from the dance, and when Tomlin and Miss Fields started to enter the same automobile, Hughes asked them not to and they went toward another car. While they were in the car, Hughes began to take liberties with prosecutrix which she resented. He then asked her to lay down on the back seat, saying that he could not have intercourse with her sitting up. She called Miss Fields and when he saw her coming he released her. She then got out of the car to go to the house, but he took hold of her hands and pulled her up the road for some distance, tripped her, and while she was on the ground again undertook to have intercourse with her, but she resisted and called for help as loud as she could. Hughes then called Tomlin to hold her while he had intercourse with her, which he did. During all of this time, according to her testimony, she resisted with all her might and called for help. After the act, she returned to the house where the dance was in progress and danced two sets before going to the home of her grandmother where she spent the night. She made no complaint concerning the outrage until the Wednesday following the occurrence on Friday night.

Miss Fields testified that she saw appellant pulling prosecutrix up the road and heard her calling for help. She heard Hughes calling for Tomlin to come and he went. She saw Tomlin take hold of the prosecutrix, (who was still screaming and calling for help) and hold her down. She further testified that she then went to where the parties were engaged in the struggle, caught Tomlin by the arms and asked him to leave prosecutrix alone. When Tomlin turned prosecutrix loose, she (Miss Fields) went back to the house and Tomlin also went back. Prosecutrix was still hollering at the time they were going back. Miss Fields testified that the reason she left was because she was afraid she might be subjected to the same outrageous conduct.

Dr. Hurst testified that a day or two after he heard of the occurrence, he examined the prosecutrix and found several bruised places on her body, especially on her lower limbs. He found that her hymen was not completely destroyed.

The appellant, Tomlin, denied having had any connection with the commission of the alleged offense; he denied hearing prosecutrix scream and call for help and denied that he held her down while Hughes outraged her. The appellant Hughes, admitted that he had sexual intercourse with prosecutrix at the time and place in question, but denied that he did so by force and without her consent. None of the other people at the dance heard any screams or calls for help.

Appellants, in an ably prepared brief, point to some discrepancies, as well as conflicts in the testimony. This court is not required to pass on these matters, since they are peculiarly within the province of the jury, who are the exclusive judges of the facts proved, the credibility of the witnesses, and the weight to be given to their testimony.

In this case the prosecutrix makes a complete case. But having failed to make any complaint until four or five days after the occurrence, the case falls within the rule requiring corroboration of her testimony in order to sustain a conviction. See Gray v. State, 93 S. W. (2d), 1146; Davis v. State, 272 S. W., 480. Therefore we must look to the testimony of other witnesses to determine whether she has been sufficiently corroborated in her testimony. The act of intercourse being admitted, we need look only for testimony showing corroboration on the question of force and want of consent.

Prosecutrix testified that Hughes tripped her up and had her laying on her back when he called to Tomlin to come and hold her down while he engaged in the act of intercourse. That she resisted with all her might and called for help, but to no avail. If this is true, there is no doubt but that she was outraged by force. On this point, we think she is corroborated by Miss Fields, who testified that she heard her screaming and calling for help. That when she (Miss Fields) arrived at the scene, appellants had her laying on her back and Tomlin was holding her down; that she took Tomlin by the arm, pulled him and told him to let her alone.

The doctor who examined her testified that he found bruises on her body, especially on her lower limbs. It occurs to us that under these facts we would not be justified in holding as a matter of law the corroboration of prosecutrix's testimony insufficient.

214

By bill of exception number one, appellants complain because the court declined to permit them to prove that the Grand Jury, at the July Term, 1937 of said Court failed to return an indictment against them, although prosecutrix appeared before said body and gave substantially the same testimony that was given upon the trial of this case. The action of the Grand Jury or their failure or refusal to indict appellants was not admissible in evidence.

Bills of exceptions numbers two and three are insufficient in that they fail to show what answers, if any, the witnesses would have given. Moreover, the questions were improperly phrased.

Bill of exception number four complains of the following argument by the county attorney: "I want to tell you that I think these boys (speaking of the defendants) are extremely fortunate. I want to commend Mr. Mills (the father of the prosecutrix) for his attitude in this matter. I say that these boys are fortunate that Mr. Mills did not take this matter into his own hands and not bring it into court and subject his daughter to the embarrassment of having to testify in this case."

Appellants objected thereto and the court sustained the objection and instructed the jury not to consider it for any purpose. The court withdrew it from the consideration of the jury; consequently no reversible error is reflected by the bill.

Appellants, in their motion for a new trial, alleged among other things that since their trial, they had discovered an important witness in the person of Barney Cogswell, who would testify that some two years prior to the time of the alleged offense, he had sexual intercourse with prosecutrix on several occasions. Appellants offered him as a witness upon a hearing of their motions and in support of its allegations. We do not deem it necessary to enter upon a discussion of his story, inasmuch as his claimed previous acts of sexual intercourse with her are not admissible in the trial of appellants for the offense of rape by force. See Wood v. State, 80 Tex. Crim. Rep., 409; Lawson v. State, 17 Tex. Crim. Rep., 292; Graham v. State, 67 S. W. (2d), 299.

Moreover the granting or refusal of a new trial based on newly discovered evidence ordinarily rests within the sound discretion of the trial court and unless it is clearly made to appear that the court abused his discretion, this court would not be justified in reversing his judgment on that question.

However, it appears to us that the claimed newly discovered evidence is impeaching in its nature, in that it is sought to

discredit the testimony of prosecutrix as to her want of consent and impeach her character for chastity. Such evidence was not admissible as original or primary evidence for the purpose of impeaching prosecutrix's character for chastity, as that could not be done in this manner, but only by proving her general bad reputation for virtue. Nor was it original or primary evidence to show want of consent in that it would necesarily fail to do so. The most that can be claimed for it is that it tended to negative resistance and want of consent. In the case of Wilson v. State, 17 Tex. Crim. Rep., 537, this court, speaking through Presiding Judge White, said: "As to the newly-discovered evidence claimed in the defendant's motion for a new trial, suffice it to say that no amount of evidence as to the prosecutrix's want of chastity should overcome proof of the fact that she was ravished by force, as shown by the violence or marks of violence upon her * * * person * * *. Rape may be committed upon the most notorious prostitute, and if the physical facts and personal violence are proven, it were worse than idle to attempt to rebut them simply by proof of want of chastity."

They also charged that since the trial, they had discovered an important witness in the person of Donese Davis. This witness testified upon the hearing of the motion for a new trial that he lived in the same community with appellants and had informed Jeff Hughes of what he saw and knew, but he was not summoned as a witness. Under the circumstances, his testimony could not be newly discovered.

In their motion for a new trial, appellants assert that the jury, in arriving at their verdict, took into consideration comments and criticisms which might be made by the public in case they acquitted appellants. There is but one juror who testified that it was mentioned by anyone in the jury room. None of the others testified to having heard such a remark. This juror testified that he was for acquittal but was anxious to go home, which prompted him to agree to a verdict of guilty. However, we note that when the verdict was received, the jury was polled and each juror stated that such was his verdict. It occurs to us that this was an attempt on the part of the juror to impeach his verdict, which is not permissible.

The many other matters complained of by appellants have been carefully examined by us and are deemed to be without merit.

No error of a reversible nature appearing, the judgment of the trial court is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

## ON MOTION FOR REHEARING.

GRAVES, JUDGE.—Appellants complain in their motion because, as they allege, there was no corroboration of the testimony of the prosecutrix, who, on account of her failure to make an early outcry and complaint, falls into the category of an accomplice witness. To this lack of corroboration we are unable to agree. Annie Mae Fields, prosecutrix's companion, testified as follows:

"We all got out of the car. Then Jeff carried her on up the road; he carried Dona. Dona told him she wanted to go back to the house. They went on up the road. As they went up the road Jeff had hold of Dona; he was pulling her up the road. They went on up the road and stopped and she called me and Jeff called Travis. She hollered for somebody to come and help her; she said for someone to come and help her. Travis went on up the road then. When she hollered to come and help her I went up there where she was at. There was some banks on that road. She was up on one of the banks. At that time Jeff Hughes was up there on the bank with her. Travis was out there in the road at that time. Jeff Hughes called Travis at that time and Travis went on up the road. I saw him catch hold of Dona Mills. He had her arm. Dona was trying to get loose at that time; she was pulling and trying to get loose. Jeff Hughes was holding her. After Travis caught hold of her I didn't see Jeff Hughes do anything to her clothes. I did not see him at any time up over her; that is, Jeff up over that girl. I did catch hold of Travis Tomlin to pull him loose. At that time he had hold of Dona. He turned loose. Jeff was there with Dona when Travis turned loose of her. He was holding her. I never saw him work with her clothes any. Dona was on her back. She told me to make 'em leave her alone. When Travis turned her loose I went on back to the house. Travis went back down the road to the house. * * *

"Dona was hollering for me to come down there. She was screaming and taking on right smart. She was calling somebody to come help her. She hollered for somebody to come over there and help her. She was still hollering that when I left. Travis and I went on back to the house while she was still hollering. I couldn't hear her when I was down to the house. I don't know just how far it was up there, whether it was 50 or 75 yards.

I think it was about half way between Shorty's and Charley Owens', maybe back towards Shorty's a little bit. She was on the ground when I left her. She said 'I want somebody to come and help me.' I didn't particularly know what was taking place. I didn't think Jeff and Dona was just wrestling. I didn't particularly know what was taking place. I didn't know exactly what was taking place. Well, yes, I had some idea why that boy would be down over her like that; have a little. I say she was calling for help, and as she was calling for help I walked off and let her alone. As to whether Travis did the same thing, I was afraid Travis was going to catch hold of me. Travis left there, though, while she was still crying for help. * * * I do know that I went up there where Jeff and Dona were. I went. I did help her. I walked away while she was still calling for help. I heard her scream outside of just calling for help; she screamed. I don't remember just how many times. I would say about four or five times."

We think the prosecutrix was amply corroborated by the above quoted statements, and also by the physician who examined her body a few days after this alleged occurrence is supposed to have happened, and found "there were several bruised places about her, on her body, and especially her limbs, lower limbs."

Appellants further complain because of the matters and things set forth in their bills Nos. 2 and 3 relative to attempted proof of the reputation of the appellants for being peaceable and quiet.

Had the question been properly framed, and been directed to their general reputation in the neighborhood in which they resided for being of a peaceable and quiet nature, such would doubtless have been admitted by the trial court. It is to be noted, however, that such question was not so phrased. It is also to be noted that the bills of exception do not show what the witness would have answered as to whether that reputation was good or bad. We could surmise that had the proper question been propounded, the witness would have answered favorably to the appellants, but we are neither required nor justified in thus going into the realm of speculation. We can only follow the rules laid down by this court as the law, evolved, as they have been, through long years of experience in such matters. As the matter is here presented, we see no error in the court's ruling.

Appellants again urge that the trial court committed error as shown by their 4th, 5th, 6th, 7th, 8th, 9th, 10th and 11th propositions, all of which can be treated together as they are all based upon the same legal principles. They are based upon

what is claimed to be newly discovered testimony, and all impeaching in their nature, such as to whether or not prosecutrix danced with Travis Tomlin after the alleged assault; or as to whether or not she made statements before the grand jury that were contradictory of her statements made on this trial; or as to whether or not she stated before the grand jury that she made outcry at the time of the alleged assault; or as to what her grand jury testimony was as to how close her girl companion, Annie Mae Fields, came to her when she was struggling with appellants at the scene of the alleged offense.

In the motion for a new trial, sworn to by appellants, by a general affidavit, the statement is made that the newly discovered testimony, relative to the statements made by the prosecutrix before the grand jury, was not known to defendants until after the trial. There is no affidavit relative to the diligence of either of the appellants or their attorneys to discover this testimony during the trial of the case; there is no reference by name as to the person who informed them of any discrepancy in the testimony of prosecutrix before the grand jury and before the trial jury, and naught to have shown that further proffered newly discovered testimony of alleged acts of unchastity between prosecutrix and others had not previously been communicated to appellants or their attorneys. We said in Garner v. State, 272 S. W. Rep. 167: "An affidavit showing that the evidence was unknown to appellant or his attorneys before the trial, that the failure to discover it was not due to a want of diligence, that its materiality is such as would bring about a different result, is essential where the ground of the motion is newly discovered evidence. See Nothaf v. State, 91 Tex. Cr. R. 378, 239 S. W. 216, 23 A. L. R. 1374, and cases cited."

In fact it is shown by one of the affidavits introduced on the motion for a new trial that one of the witnesses, relative to having seen a specific sexual act of the prosecutrix, had communicated to the appellant Hughes what his statement would be as to such matter. Ordinarily the probable truth of the newly discovered testimony is a matter for the court, as is also the fact as to whether its introduction would have affected and probably changed the verdict. The trial court's holding herein is tantamount to saying that it would not have probably changed the result of the trial. The appellants were given the lowest penalty by the jury, and, therefore, in the event of a conviction it could not have decreased the penalty. According to Hughes' own testimony, he had intercourse with this helpless girl, and, according to her testimony, he seemed to have been experienced in such matters, as evidenced by her testimony, while struggling with

her, when he said: "Hell, you just as well to come on and give me a piece; you are out with old Hughes now; when he takes 'em out he gets it."

While these cases are matters that easily arouse the prejudice and passions of a jury, and might cause them to give a more severe penalty than might be warranted under the facts, we feel that such has not been done in this case. The young lady had a right to preserve the sanctity of her body, and if the testimony in this case is to be believed, as it seems to have been by the jury, she did her best to keep this young man Hughes from violating her, and so successful was she in her efforts that it necessitated the aid of his companion, Tomlin, before their joint efforts overcame her resistance. They placed themselves in this unfortunate position in order to gratify the unholy lust of Hughes, and we can see no legal reason why they should be extricated unless they have not received their legal rights under the law. We think their legal rights have been accorded them, and we see no reason to recede from the position taken in the original opinion, and the motion is therefore overruled.