# MELVIN HINDMAN v. THE STATE.

No. 23899. Delivered March 31, 1948.
Rehearing Denied May 19, 1948.

76

*Brooks, Duke & Templeton,* of Abilene, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

The conviction is for rape. The punishment is assessed at five years in the penitentiary.

Prosecutrix, fifteen years of age, worked as a waitress in a cafe at Abilene. She had met appellant as a patron of the cafe. On June 1, 1946, she left the cafe at night to go home. On her way, she stopped at a drug store and was eating a sandwich when appellant, accompanied by the witness Spratlin, entered. Appellant asked to take her home. She first declined, then agreed. Appellant, prosecutrix, and Spratlin left the drug store, got into the front seat of appellant's car, and drove away. Spratlin asked them to take him out to the State Hospital to get his girl friend, who worked there. They drove to the hospital; Spratlin went in, got his friend, returned, and they got into the rear seat of the car.

It should be here stated that at this time Spratlin and his girl friend were not married. However, they married shortly thereafter and testified in the trial of the case. They appeared as witnesses in the trial as W. H. Spratlin and Mrs. W. H. Spratlin. They will be so referred to, hereafter.

According to the testimony of prosecutrix, appellant drove about a half-mile from the hospital and stopped the car on a gravel road. He then told the Spratlins to leave the car and not come back until "* * * I honk." The Spratlins left the car. Prosecutrix said it was a dark night and she did not know how far they went from the car. As soon as the Spratlins left, appellant began to fondle her person, seeking sexual favors. Prosecutrix resisted, and appellant struck her under the chin and on the face, trying to knock her out. About that time she screamed and the Spratlins returned to the car. Thereupon, appellant ordered them to go away and not return until "I honk my horn like I said the first time." Prosecutrix said at this time she told Spratlin that appellant was trying to rape her and that Spratlin told appellant to leave her alone. The Spratlins again left the car and it was then that appellant, according to prosecutrix, completed the act of rape upon her, a virgin female. As to how this was accomplished, we quote from the testimony of prosecutrix:

"I was lying on the cushion on the front seat. There was a steering wheel in the front part of the car. That is where my head was. My head was by the steering wheel. He did not get out of the car, go around and get in at the other door. He was already on the other side. I did not get under the steering wheel. I got under there while we were fighting. We were fighting. When he penetrated my private parts he had my hands under my head and was holding one. He had one hand here (indicating) an then he was holding this one (indicating). He was holding my left hand. He put my right hand under the back of my head. My right hand was under my head and he was holding the other one. He did not have both hands holding me. He had this hand drawn up like this (indicating). I don't exactly know what he was doing with the other hand. My feet were spread out. I imagine his feet were in the car. The door was open. His feet were not in the car. His feet were out of the car. I did not pay any attention to his feet."

Prosecutrix further testified:

"I fought until everything was just kind of foggy; after we fought so long."

It is indicated from her testimony that this occurred before the Spratlins returned to the car the first time. Prosecutrix, according to her own testimony, was able to detail appellant's acts and conduct immediately before and at the time the completed act of rape was accomplished. Prosecutrix said that ap-

pellant "tore my pants off of me and tore up one of my slips" and that after the act, appellant honked the horn and the Spratlins returned to the car. She admitted that "there was not anything to prevent me from honking that horn" and that she knew "that was the sound that was agreed to be given when we wanted to go." Prosecutrix admitted that she did not tell the Spratlins about what had happened when they returned to the car. She said that she did not tell Mrs. Spratlin, after she was in the car, that appellant had raped her. Appellant, accompanied by the Spratlins, carried the prosecutrix home. She admitted that she made no report to her mother or father as to what had happened. She said she secreted her torn slip so that they would not find out. Prosecutrix admitted that she told no one about what had happened to her until sometime in December, over six months thereafter, when she went to see a lawyer, who advised her to go and be examined by a doctor. She said that Dr. McFadden did examine her. Neither the lawyer nor Dr. McFadden testified in the case. According to prosecutrix's testimony, her only reason for not making an outcry to her parents or the officers or a report of the assault on the night it occurred was because appellant had threatened to kill her if she told anyone and because she was afraid that her father would kill appellant and she did not want a killing. As to what prompted her to make the disclosure in December, the record is silent.

Prosecutrix's father testified that on or about the 1st of June, he noticed some blue spots on her neck and face. He made no effort to describe the nature or extent of the spots or to fix the time as after the alleged offense. They were not of sufficient importance to cause him to inquire of his daughter relative thereto.

The foregoing are the facts upon which the conviction rests.

Mrs. Spratlin, though offered as a witness by the State, became a material witness in behalf of appellant. She testified that on the way out into the country:

"I noticed the attitude of Ann (prosecutrix) towards the defendant here. They were hugging and kissing as we were going out there. She was leaning on him all of the time. They appeared like they were good lovers."

Mrs. Spratlin said that after the car stopped, she and her husband got out and walked about fifty yards from the car; that it was a moonlight—a starlight night. "We could see the

car all of the time we·were out there. I did not hear anything unusual except in a playful manner there in the car." She said that she heard a scream, which was a "playful holler," and it did not impress her as being serious. She said that at no time did prosecutrix report to her that appellant had raped her or wronged her, and further, "I did not see any bruises on her. I did not see her underclothes there in the car at any time. She did not complain about her clothes being torn off. She didn't say anything to us. She didn't say a word about it. I do not remember seeing either one of the front doors open when we got back there. I did not see any of her clothes messed up in any way at all."

Mr. Spratlin corroborated the testimony of his wife and was equally positive that prosecutrix made no claim to them that appellant had mistreated her. He said that it was a clear moonlight night and that he and his wife could see and observe the car very clearly at all times and that they were never more than fifty yards from the car. He denied that appellant ordered him and his wife to get out of the car when it was first stopped or that appellant honked the horn before they went back to the car. He said that after they left the car the second time, only about five or six minutes elapsed before appellant called to him and his wife, "Let's go."

There was testimony showing that, after the time fixed by prosecutrix as to when the offense was committed and before she had made same known to any person, prosecutrix went riding with appellant and hugged and kissed him in the presence of others. Prosecutrix denied this testimony. There was testimony showing acts of misconduct on the part of prosecutrix, which she denied, with other men—none of which, however, went so far as to show that she had engaged in acts of sexual intercourse with others. One witness testified that some time during the months of June or July, 1946, prosecutrix told him that she had engaged in acts of intercourse with others. Prosecutrix denied that she made such a statement. There was testimony that prosecutrix bore a bad reputation for virtue and chastity. The State introduced testimony showing her good reputation in that particular.

It is upon the facts stated that the conviction rests. Appellant did not testify.

It is insisted that the prosecutrix is not corroborated in any particular, and that the conviction, as a matter of law, should not be sustained for that reason.

It has long been the rule in this State that in cases of rape by assault, a conviction will not be sustained upon the uncorroborated testimony of a female who fails to make prompt outcry or a report of the rape when opportunity to do so was reasonably afforded. Branch's P. C., Sec. 1784, and authorities there cited. Gray v. State, 130 Tex. Cr. R. 289, 93 S. W. (2d) 1146; Armstrong v. State, 136 Tex. Cr. R. 333, 125 S. W. (2d) 578; Hughes v. State, 136 Tex. Cr. R. 210, 124 S. W. (2d) 349, and Ex Parte Merrill, 201 S. W. (2d) 232.

In Ex Parte Merrill, supra, we said, relative to the rule stated:

"Such rule is founded not upon the ideas that such failure to make outcry tends to connect the prosecutrix with the alleged crime and therefore require that she be corroborated as an accomplice but because it tends to lessen or diminish the credit to be given to her testimony."

Another rule of long standing is that a conviction will not be sustained on the uncorroborated testimony of a woman who failed to make prompt outcry and where, if her testimony was true, it was susceptible of corroboration, or where the facts stated by her, which were capable of corroboration, were disproved. Branch's P. C. 1784; Lawson v. State, 17 Tex. App. 292-304; Arnett v. State, 40 Tex. Cr. R. 617,, 51 S. W. 385; Cowles v. State, 51 Tex. Cr. R. 498, 102 S. W. 1128; Ayres v. State, 104 Tex. Cr. R. 329, 283 S. W. 828.

Appellant insists that the rules stated sustain his contention and are controlling here, especially because of the failure of the prosecutrix to make an outcry.

The cited cases reflect that the rules stated were based upon the question of consent, where consent is an issue. Such, of necessity, contemplates cases of rape by force and threats, where consent may be a material inquiry. In statutory rape the issue of consent cannot arise, for that offense is complete with or without the consent of the prosecutrix.

As a general proposition, this court has refused to apply the rule stated—that is, requiring corroboration where the prosecutrix fails to make outcry promptly or within a reasonable time, in a statutory rape case. Moore v. State, 90 Tex. Cr. R. 604, 236 S. W. 477; Raifsnider v. State, 146 Tex. Cr. R. 578, 176 S. W. (2d) 952; Armstrong v. State, 95 Tex. Cr. R. 107, 252 S. W. 777.

However, in the early case (1884) of Gazley v. State, 17 Tex. App. 267, the court refused to affirm a conviction of rape upon the uncorroborated testimony of a child between the age of nine and ten years who made no outcry and whose testimony could have been corroborated, if true, by other testimony not produced, coupled with the highly incredible testimony of the prosecutrix as to the commission of the crime, in the first instance.

In Ayres v. State, 104 Tex. Cr. R. 329, 283 S. W. 828, this court refused to sustain a conviction for rape of a sixteen-year old female because her testimony as to the act of intercourse was so improbable as to stagger credulity. Therefore, it appears that there is no fixed rule requiring corroboration of the testimony of the prosecutrix in a statutory rape case. Appellant's contrary contention is overruled.

The law requires close scrutiny of convictions resting alone upon the uncorroborated testimony of a prosecutrix in a rape case who testifies to facts showing a rape by force and who makes no outcry. On the other hand, the jury are the exclusive judges of the facts proved and of the credibility of the witnesses, which the courts should be slow to overturn.

The witness, Mr. Spratlin, though summoned by the State, was introduced by the appellant. Upon direct examination, this witness was not interrogated as to whether he heard the prosecutrix scream. However, upon cross-examination, he admitted that he had testified before the grand jury, and that he also made a written statement to the prosecuting attorneys wherein he stated, "I heard the girl (meaning prosecutrix) screaming for help." Counsel for the State interrogated the witness at some length regarding the statement. Upon re-direct examination, the witness explained the statement by saying that he did not intend to say that the prosecutrix was screaming for help, but what happened was that she "just hollered" and that "it didn't sound to serious to me at the time," and that "to me she did not appear to be in distress." Witness further testified that after the written statement had been made, he called the attention of the prosecuting attorneys to the fact that the statement was in error in that prosecutrix "screamed for help", as he never understood that she screamed for help.

The written statement referred to was not offered in evidence. The prosecuting attorney did not testify upon the trial of the case contradicting Spratlin's testimony relative to the

claimed mistake in the statement. Such is the condition existing when the prosecuting attorney came on to close the argument to the jury.

Relative to Bill of Exception No. 13, it appears from the State's testimony herein that Mr. Spratlin and his after-acquired wife were present with appellant and this then fifteen-year old girl in a car at the time of the complained-of occurrence at night-time. The girl was working at a restaurant and became acquainted with appellant there. She met him at a drug store at night after her work was done. She was on her way home alone and he asked to take her home. He had a car and W. H. Spratlin was with him. She got in the car. Spratlin wanted to go by the State Hospital and get his girl, whom he later married. They went there and got the future Mrs. Spratlin. They then drove about a mile on a gravel road. Appellant told Spratlin and his girl to get out of the car and not come back until he honked. They got out of the car and went away. Appellant began to try to fondle this girl and tried to reach her private parts. She begged him to leave her alone and fought and argued with him. He hit her under the chin and on the face. She fought him until everything became foggy. He tore her pants off and tore up one of her slips and finally penetrated her body, giving her great pain. She screamed and Spatlin and his girl came to the car, whereupon appellant said: "This is my damned jalopy, and I mean stay away until I honk my horn like I said the first time." They went away. After he had intercourse with her, appellant said: "If you breathe a word of this I will kill you or have you killed. * * * If you take it to court I will get boys to swear that they have got to you." After that he called Spratlin and his girl back to the car. She did not say anything to appellant or to the Spratlins after they got in the car. She was too angry. She was hurt very much. Her face was bruised and swollen where appellant had struck her. She did not report this matter to anyone at that time. She was afraid of appellant. She was fifteen years of age on March 21, 1946, and this matter occurred on June 1, 1946. On cross-examination she said:

"I screamed. I did call them to come and help me. All I did was call for help. That is all I did. One time when I called for help they came. I told them then that he was trying to rape me. I told them that he was trying to rape me. W. H. told him to leave me alone. W. H. Spratlin told Melvin to let me alone. That is right. * * * Going on home I just told the girl that he had raped me. I told the girl that he had raped me and tore my pants off. I told Mrs. Spratlin that. I am positive I told her that."

This is a portion of the prosecutrix's testimony.

The State seems to have had both Mr. and Mrs. Spratlin before the grand jury and to have taken a written statement from them. Although they were summoned by the State and Mrs. Spratlin was used in the trial, it seems that Mr. Spratlin was not used as a witness by the State. She testified relative to the trip from the State Hospital out on the road and to the stopping of the car. She said that she and her husbtand left the car and went about fifty yards therefrom; that after they got away from the car, she heard the prosecutrix scream, and they went to the car. The girl was mad and appellant said: "Get away from here. This is my jalopy." He said he would honk for us to come back. * * * We went on back because he told us to go back. * * * When we got back to the car her hair was messed up. She was not talking any. She did not talk any. She did not say anything." The witness testified further:

"From the time we left the place where this occurred to her home, she did not talk any. She acted mad. When she got out of the car at her home down here she did not tell us good bye and good night. She just got out and went in the house. She did not tell Melvin Hindman good bye. She did not tell us good bye."

Relative to the girl screaming, the following was developed on cross-examination:

"When we came back to the car, when I heard her scream, as to that as a matter of fact being just a playful holler, it didn't sound very serious to me. As far as the voice that I heard and the noise I heard her making, it all appeared to be in play. I did not apprehend that there was anything going on there except play."

This witness denied that the girl told her she had been raped or that she evidenced any bruises of any kind. On re-direct examination the witness testified:

"I have stated that I thought that her screaming was just in play. I made a sworn statement to you. When she was screaming, as to it being a fact that she was screaming for help, I do not know what she was screaming for."

As heretofore stated, W. H. Spratlin was summoned by the State but was not placed on the stand by it. However, he took the witness stand for the appellant. His direct testimony was practically the same as that of his wife. On cross-examination,

84

he testified about the drive from the State Hospital, about getting out of the car with his soon-to-be wife, about kissing and hugging her, but claimed to have kept a watch on the car as well as the appellant and the girl. He testified:

"I heard a scream at the car. I heard that."

"Q. And you thought it was a scream for help didn't you? A. Well, my wife made that in the testimony. I came along and signed a statement to that effect. I went before the grand jury also and swore to the same statement, 'I heard the girl screaming for help.' That is a fact.

"It is true then that she did scream?

"Q. And you put it in your statement here, 'I heard the girl screaming for help' and you swore to that and swore to it before the grand jury, didn't you? A. My wife made a statement and I signed it.

"Q. And you swore to it? Then, after you heard this scream for help then you went back to the car didn't you? A. A little bit after I heard it.

"When we got back to the car Melvin Hindman said to me, 'This is my jalopy and I don't intend for you to come back until I honk the horn.' When he said that my wife and I went back. We left the car. * * * Later he did not honk the horn for us to come. He said, 'Let's go.' * * *

"Q. You stated in your statement here, did you not, 'Her hair was torn up and she was mad'; didn't you make that statement? A. I signed that statement. I swore to that statement. I swore to that before the grand jury. That is true. It has been a long time since that came up and there is a slight mistake on some of that. It came back to me after I got to thinking about it. * * * I said I did not want to sign it (the statement) because he was my friend. * * * It is a fact that she did not talk to Melvin Hindman after we got back to the car. From the time we left the scene out there she did not say a word."

On re-direct examination Spratlin testified:

"When she screamed she just hollered. It didn't sound too serious to me at the time. To me she did not appear to be in distress. I called Mr. Hayden off after the statement had been made and told him that I thought there was a mistake in there; that I didn't remember it, 'That she screamed for help'; that is, as I understood it, 'I did not understand her screaming for help.' Mr. Hayden said, 'All right.' "

The gist of Bill of Exceptions No. 13 seems to be not that the girl "screamed" while she was in the car alone with appellant but whether she "screamed for help" as the Spratlins seem to have said in their statement before the grand jury, or whether she "hollered as though in play" as the Spratlins evidently intended to convey to the trial jury. There was testimony by the Spratlins that after they had signed the grandjury statement evidently containing the phrase "she screamed for help", they got to thinking over the matter and desired to eliminate the "for help" portion of the statement, thus contradicting a very material part of their testimony. We think the District Attorney could show that W. H. Spratlin, a defense witness, had made statements contradictory to his testimony on the witness stand, and he sure had the right to comment on the testimony of Mrs. Spratlin, his own witness, when she admitted that she wanted to and did change from a "scream for help" to a "playful holler". We think that all the District Attorney did in this Bill No. 13 was a fair comment on the testimony presented. It certainly did not cause the jurors' minds to become inflamed against him since appellant received the lowest penalty affixed by law.

In order that this bill may be thoroughly understood, the same is copied in full herein:

"Be it remembered upon the trial of the above numbered and entitled cause, among other things, the following proceedings were had while Judge Hayden, the District Attorney, was making his closing argument to the jury:

"Mr. Hayden: (Referring to W. H. Spratlin and his wife), 'As they told you they came to me after, one of them did, came to me after they had sworn to this statement and after they had gone before the grand jury and sworn to the same thing when they tell you they came to me and asked me to change it. I ask you why they asked me to change it? You know and I know it was just about the time of the other trial, according to *Spratlin*, about the time getting up to testify; he was afraid to testify. What was their testimony? This is my jalopy and I - - - '.

"Mr. Brooks: Wait a minute, your Honor. We object to him reading from a statement made by somebody, some person that we have not—not in evidence, and we object.

"The Court: The statement was not introduced in evidence. Don't read it.

"Mr. Hayden: No, but the words.

"Mr. Brooks: I am refreshing my memory.

"The Court: You can quote but don't read from the statement

"Mr. Hayden: When they came back there and why did they come back? Under his statement, as he told you on the stand there, 'I heard her scream', and what was that scream? Both of them said it was for help. That was before they got up to the trial of this case.

"Mr. Brooks: We object to that argument and ask the Court to instruct the jury not to consider the remarks of the prosecuting attorney as to what the statement contained.

"The Court: Overrule the objection.

"Mr. Brooks: Note our exception.

"Mr. Hayden: Then they tried to change but they were bound by something that they had testified to before under oath and before the grand jury, as they ought to, and that night out there they knew that something was wrong. Why did the defendant tell them to go back if something wasn't wrong? And they said. 'We went up there and she was mad, and she looked like she was hurt and her hair was disheveled.' That's the unvarnished testimony of those people and the undisputed evidence is that they came all the way to town without - - .

"Mr. Brooks: We again ask the Court to instruct the jury not to consider any remarks *me* made about what the testimony was before the grand jury, being his statement and not the statement before the grand jury.

"The Court: Overrule the objection.

"Mr. Brooks: Note our exception.

"Defendant by his attorney objected to the argument of the District Attorney for the reason stated above, the court overruled defendant's objection and permitted the argument to go before the jury and be considered by them in arriving at their verdict, to which the Court here certifies to be correct and hereby allows this defendant's Bill of Exception No. 13, to be as a part of the record in this cause, which is accordingly done."

Surely this testimony relative to the difference between the evidence of these witnesses before the grand jury and that given upon the trial was admissible as an impeachment of these wit-

nesses, and it is worthy of note that no request was made to limit such testimony to a matter of impeachment only and no such objection was leveled at the charge of the court. We see no error reflected in the court's ruling.

Finding no error shown herein, the judgment is affirmed.

### ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

We gather from appellant's motion for rehearing that because we did not discuss every point raised by him he assumes they were not considered.

Many times questions are raised that have been so well settled it adds nothing to the jurisprudence of the State to discuss them again. This is illustrated in the present case by an exception to the charge of the court because the jury was not instructed that prosecutrix was an accomplice. This objection was in the face of the unbroken line of decisions to the contrary. See Hamilton v. State, 36 Tex. Cr. R. 372, 37 S. W. 431; Cook v. State, 88 Tex. Cr. R. 659, 228 S. W. 213; Donley v. State, 44 Tex. Cr. R. 428; Lucas v. State, 86 Tex. Cr. R. 439; 216 S. W. 396; Brewer v. State, 95 Tex. Cr. R. 521, 254 S. W. 809; Battles v. State, 63 Tex. Cr. R. 147, 140 S. W. 783.

Let it be understood now that all objections to the charge were considered as well as other questions raised by bills of exception, and were thought not to be meritorious whether or not they were specifically discussed.

We will give attention to such matters as appeal to us as meriting particular mention.

Appellant especially complains because we did not discuss his bills of exception numbers 3, 6, 12 and 14. The court qualified each of these bills, which were accepted by appellant without objection. Considered in connection with the qualification neither of the bills are thought to present error.

Appellant insists that the trial court should have given a peremptory instruction to the jury to return a verdict of not guilty because prosecutrix waited too long to complain about appellant's conduct. In support of his position he cites Merrill v. State, 201 S. W. (2d) 232; Price v. State, 35 S. W. 988; Gray

v. State, 130 Tex. Cr. R. 289, 93 S. W. (2d) 1146. In Merrill's case prosecutrix was eighteen years old; in Price's case she was twenty-one years old; in Gray's case she was over eighteen years old. In the present case prosecutrix was only fifteen years old, and the prosecution was for rape of a female under the age of consent. If a female consents to intercourse it is not likely she will report the matter, but this does not excuse criminality of the man who has enjoyed her sexual favor.

Appellant particularly stresses paragraph eight of his objections to the court's charge, in which objection complaint is made because the court did not tell the jury:—"* * * if they should find and believe from the evidence that prosecutrix was in company with and rode in the car with defendant subsequent to the alleged offense, or if they had a reasonable doubt thereof they will acquit the defendant, this being an issue made by the evidence in this case that prosecutrix did ride in a car with defendant and hugged and kissed him approximately five weeks after the alleged offense."

If the court had given the charge there suggested it would have been an instruction on the weight of the evidence, and would have been equivalent to withdrawing from the jury the right to determine from all the facts whether appellant had intercourse with prosecutrix upon the occasion under investigation. If she was under the age of consent and appellant had intercourse with her he would be guilty under the law, although she might later have gone with him and even hugged and kissed him.

We have again examined the record and all bills, and objections to the court's charge, and same have had our attention whether discussed in detail or not. We fail to discover any reversible error.

The motion for rehearing is overruled.